NATIONAL PRESTO INDUSTRIES, INC. AND SUBSIDIARY
CORPORATIONS, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 24668–92.  Filed May 3, 1995.

*Robert A. Schnur* and *Joseph A. Pickart,* for petitioner.
*Gregory J. Stull,* for respondent.

PARKER, *Judge:* Respondent determined a deficiency in petitioner's consolidated Federal income tax in the amount of $298,290 for the taxable year ended December 31, 1987. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue to be decided in this case is whether an account receivable in the amount of $2,388,824 from petitioner National Presto Industries, Inc., reflected on the books of the National Presto Industries, Inc. Employees' Benefit Trust as of the close of the taxable year ending December 31, 1984, constitutes "assets set aside" for purposes of section 419A(f)(7).[1]

---

[1] In the notice of deficiency, in addition to the disallowance of a portion of the deduction petitioner claimed for contributions made to the National Presto Industries, Inc. Employees' Benefit Trust, respondent disallowed other deductions in the amount of $87,097 and allowed a deduction from gross income for environment tax in the amount of $448. Petitioner did not raise these issues in the petition, Rule 34(b)(4), and on brief expressly conceded these issues.

## FINDINGS OF FACT

This case was submitted to the Court fully stipulated, and the facts as stipulated are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

At the time the petition was filed in this case, petitioner's principal place of business was 3925 North Hastings Way, Eau Claire, Wisconsin. Petitioner National Presto Industries, Inc., and its subsidiaries are corporations that file consolidated income tax returns. Petitioner maintains its tax records on the accrual method of accounting and has adopted the calendar year as its taxable year.

Petitioner established the National Presto Voluntary Employees' Beneficiary Association (the National Presto VEBA) as of December 15, 1983, as a funding vehicle to provide for health and welfare benefits to employees. Pertinent provisions of the agreement and declaration of trust of the National Presto VEBA are as follows:

### I. ESTABLISHMENT AND PURPOSE

1. *Establishment and Name of Trust*

There is hereby established a Trust, to be known as: National Presto Industries, Inc. Employees' Benefit Trust hereinafter referred to as the Trust. The corpus of the Trust shall consist of such sums of money and other property acceptable to the Trustee as shall from time to time be paid or delivered to the Trustee and such earnings, profits, increments and accruals thereon as may occur from time to time, less the payments which at the time of reference shall have been made by the Trustee as authorized herein, such corpus being hereinafter referred to as the Trust Fund or Fund.

2. *Designation of Plans*

The Grantor [National Presto] shall from time to time determine which employee benefit plans (hereinafter referred to as the "Plans" or a "Plan") maintained by the Grantor, and/or any of its subsidiaries, shall be eligible to have benefits thereunder paid from the Trust provided, however, that the benefits included under a "Plan" may only provide life, sick, accident or other benefits described in Section 501(c)(9) of the Code and the regulations thereunder.

3. *Purpose of Trust*

The purpose of the Trust is to provide benefits under the Plans to eligible employees, former employees and/or their dependents, in the event of death or illness or expenses for various types of medical care and treatment. It is the intention of all parties, that the benefits are limited to those which may be financed from the assets of the Fund, after the payment from the Fund of the expenses of establishing and administering the

Trust and the Plans. It is expressly understood and agreed that there is no liability upon Grantor [National Presto], or the Trustee, for the furnishing of any specific type or amount of insurance or benefit to any employee, former employee, or any of their dependents, except as set forth in the Plan or Plans to be funded by the Trust which Plans are attached hereto and made part hereof.

\* \* \* \* \* \* \*

## 8. *Contributions*

The term Contributions shall mean the money paid to the Fund by Participating Employers and/or Participating Employers and their Plan Participants jointly, in accordance with such Participating Employers' unilateral determination and discretion (except as may be required for the purchase or funding of specific levels of benefits provided for by the Plan or Plans to be funded by the Trust and the payment of the expenses of establishing and administering the Trust and the Plans that may be adopted), and any retrospective rate credits, dividends, or experience rate refunds from any insurance carrier which has or may issue a policy or policies of insurance hereunder.

## 9. *Funding Policy*

It is the policy of this Trust that the contributions, which shall be irrevocably made by Participating Employers, and/or Participating Employers and their Plan Participants jointly, be determined actuarially on the basis of the benefits provided; and, the age, sex and number of Employees and dependents of Employees who voluntarily elect to participate in the Plan or Plans of benefits to be funded hereunder.

The minimum contribution, to be made to this Trust in each Plan fiscal year, shall not be less than: an amount to provide the payment of anticipated benefits during such year; plus, an amount sufficient to pay premium or other charges under any insurance policy or policies issued to the Trustee in connection with the Plan; and, the cost of legal, accounting, actuarial and administrative services which may be required by this Trust at the sole discretion of the Trustee.

Notwithstanding the requirements imposed upon participating employers and their Plan Participants by the stated minimum contribution, the fiscal policy of this Trust contemplates the level funding of the reasonably anticipated needs of the Plan. Funding will be actuarially determined on the accrual basis, with provisions for contingency reserves and reserves for claims incurred but not revealed for each current year and for future years so as to equalize to the extent possible each year's contribution.

## III. ADMINISTRATION

\* \* \* \* \* \* \*

6. The Trustee shall have the power to demand and receive Participating Employers' Contributions as agreed from time to time, and shall hold such monies as part of the Trust Fund for the purposes specified in this agreement.

7. The Trustee shall establish a uniform system for the timely transmission of reports and Contributions and establish a periodic date upon which such reports and Contributions shall be due.

8. The Trustee, in its absolute discretion, may pay out of the Trust Fund, premiums and/or benefits on behalf of Plan Participants of a Participating Employer in the event such employer shall fail to remit the required Contributions. In this event, such employer shall remain liable for the full amount of Contributions due during the period for which premiums and/or benefits were so paid by the Trustee.

9. The Trustee shall have the power and duty to demand, collect and receive a Participating Employer's Contributions, and to take such steps as may be necessary or desirable to effectuate the collection of such Contributions, including the institution and prosecution of, or the intervention in, any legal action or proceeding at law, equity, or bankruptcy, together with the right to compromise any such action or proceeding and the employment of counsel in connection therewith.

\* \* \* \* \* \* \*

14. Notwithstanding the provision of Article III, Paragraph 6, so as to preserve the Trust Fund against premiums which may fall due for insurance, or benefits payable in accordance with any plan to be funded hereunder on account of Participating Employers not having remitted to the Trustee the required Trust Contribution prior to the due date thereof, the Trustee shall send a notice of Contributions due not less than thirty days prior to any Contribution due date, to each Participating Employer. In the event a Participating Employer's Trust Contribution remains unpaid as of the due date, the Trustee shall send a notice specifying the date of termination of coverage and the last date on which Contributions may be made to negate such termination. Additionally, with respect to any benefit which is contemplated by any plan to be funded hereunder, the Trustee may, in his discretion, not honor any claim presented against the Trust, by any person claiming hereunder, which claim was incurred after the date upon which such person's employer is determined to be delinquent.

## IV. MISCELLANEOUS PROVISIONS

\* \* \* \* \* \* \*

4. Title to the Trust Fund shall be vested in the Trustee, and shall remain so vested, exclusively in the said Trustee. Neither the Grantor, the participating Employers, eligible Employees, nor the Employee's dependents shall have any right, title, or interest in the Trust Fund, nor any right to the Contributions made thereto.

\* \* \* \* \* \* \*

6. No amendment may be adopted which:

   A. would cause any asset of the Fund to revert to the Grantor, or any Participating Employer, or be diverted to purposes other than the exclusive benefit of the Employees, former Employees or their dependents, other than the refund of contributions which have been made to the Trust result-

ing from mistake of fact or if any such contribution was made in anticipation of its deductibility which deduction was disallowed.

\* \* \* \* \* \* \*

11. Subject to the provisions for the termination of this Trust, the Trust shall be irrevocable and under no circumstances shall any monies or property properly paid into the Trust Fund, or any part of the Trust Fund be recoverable by, or payable to, the Grantor or any Participating Employer, other than for reasonable and necessary expenses incurred on behalf of the Trust, nor any of the same be used for or diverted to purposes other than for the exclusive benefit of beneficiaries hereunder.

In a determination letter, respondent determined that the National Presto VEBA is an employee benefit trust exempt from income tax under section 501(c)(9).[2] For the taxable years 1983, 1984, 1985, 1986, and 1987, the National Presto VEBA maintained its status as an organization exempt from income tax under section 501(c)(9). Although petitioner's subsidiary corporations were participating employers, no employer other than petitioner contributed to the National Presto VEBA. The financial statements of the National Presto VEBA, however, indicate that employees made contributions to the VEBA during the taxable years ending December 31, 1984, through December 31, 1987. The National Presto VEBA has adopted the calendar year as its taxable year.

For the taxable years 1983 through 1987, petitioner claimed income tax deductions for contributions to the National Presto VEBA determined under the accrual method of accounting. Petitioner did not actually pay the amount deducted during the calendar year for which the deduction was taken. For the taxable years 1983 through 1987, petitioner claimed deductions under the accrual method and made payments of contributions to the National Presto VEBA in the following amounts:

| | Deductions | | Contributions | | |
| Year | Claimed | Cumulative | Paid | Cumulative | Difference |
|---|---|---|---|---|---|
| 1983 | $1,725,684 | $1,725,684 | -0- | -0- | $1,725,684 |
| 1984 | 1,451,184 | 3,176,868 | $768,305 | $768,305 | 2,408,563 |
| 1985 | 1,007,903 | 4,184,771 | 879,700 | 1,648,005 | 2,536,766 |

[2] Sec. 501(c)(9) specifies as organizations exempted from taxation under sec. 501(a):

Voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual.

|  | Deductions | | Contributions | | |
| Year | Claimed | Cumulative | Paid | Cumulative | Difference |
|---|---|---|---|---|---|
| 1986 | -0- | 4,184,771 | 1,856,154 | 3,504,159 | 680,612 |
| 1987 | 1,025,021 | 5,209,792 | 1,705,633 | 5,209,792 | -0- |
| Total | 5,209,792 | | 5,209,792 | | |

Petitioner's payment to the National Presto VEBA during the 1986 taxable year in the amount of $1,856,154 relates solely to amounts that petitioner had previously deducted but had as yet not paid in taxable years 1983, 1984, and 1985. As of the end of the taxable year 1986, petitioner had claimed deductions totaling $4,184,771 ($1,725,684 + $1,451,184 + $1,007,903 + $0) and had made payments to the National Presto VEBA totaling $3,504,159 ($0 + $768,305 + $879,700 + $1,856,154). As of the end of the taxable year 1986, the aggregate amount of the deductions claimed by petitioner exceeded the aggregate amount paid to the National Presto VEBA by $680,612 ($4,184,771 − $3,504,159).

With respect to petitioner's payment of the contribution to the National Presto VEBA in the amount of $1,705,633 during the taxable year 1987, petitioner applied $680,612 toward unpaid but previously deducted contributions and claimed a current deduction for the balance in the amount of $1,025,021 ($1,705,633 − $680,612) for the taxable year 1987.

The financial statements of the National Presto VEBA for the taxable years 1983, 1984, and 1985 state that, for those years, the VEBA did not have investment income because "the Plans fund benefits paid and expenses *as incurred*". (Emphasis supplied.) At the close of each of the taxable years 1983 through 1987, the ending balances, inclusive of accounts receivable from petitioner, were recorded on the books of the National Presto VEBA in the following amounts:

| Item | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| Assets: | | | | | |
| Cash | $100 | $19,908 | $18,932 | $51,292 | ($26,366) |
| Investments | 420,000 | -0- | -0- | 923,755 | 1,626,112 |
| Receivables due from employer | 1,725,684 | 2,388,824 | 2,372,554 | 516,399 | -0- |
| Total assets | 2,145,784 | 2,408,732 | 2,391,486 | 1,491,446 | 1,599,746 |
| Liabilities: | | | | | |
| Unpaid claims | 379,002 | 377,225 | 327,989 | 857,071 | 853,771 |
| Net Assets | 1,766,782 | 2,031,507 | 2,063,497 | 634,375 | 745,975 |

The financial statements explain the changes in the National Presto VEBA's net assets for the years 1983 through 1987 as follows:

| Item | 1983 | 1984 | 1985 | 1986 | 1987 |
|------|------|------|------|------|------|
| Additions: | | | | | |
| Contributions: | | | | | |
| Employer[1] | $1,766,818 | $1,272,672 | $916,494 | -0- | $1,189,234 |
| Employee | -0- | 128,101 | 102,013 | 91,277 | 80,367 |
| Deposit at Travelers | 420,000 | -0- | -0- | -0- | -0- |
| Deposit by petitioner | 100 | 19,808 | (976) | -0- | -0- |
| Investment income | -0- | -0- | -0- | 41,122 | 40,531 |
| Total | 2,186,918 | 1,420,581 | 1,017,531 | 132,399 | 1,310,132 |
| Deductions: | | | | | |
| Benefits | 420,136 | 1,060,659 | 930,761 | 1,483,491 | 1,012,141 |
| Administrative expenses | -0- | 95,197 | 54,780 | 78,030 | 186,391 |
| Total | 420,136 | 1,155,856 | 985,541 | 1,561,521 | 1,198,532 |
| Net additions (deductions) | 1,766,782 | 264,725 | 31,990 | (1,429,122) | 111,600 |
| Beginning year balance | -0- | 1,766,782 | 2,031,507 | 2,063,497 | 634,375 |
| End of year balance | 1,766,782 | 2,031,507 | 2,063,497 | 634,375 | 745,975 |

[1] The Court notes that the employer contributions as reflected on the books of the National Presto VEBA total $5,145,218. The parties have stipulated that petitioner made payments to the VEBA totaling $5,209,792. The parties have not explained to the Court the reason for the $64,574 discrepancy.

At the close of the taxable year ending December 31, 1984, the National Presto VEBA had total assets of $2,408,732 that consisted of a cash balance in the amount of $19,908 and an account receivable for accrued but unpaid employer contributions in the amount of $2,388,824. As of the close of the 1984 taxable year, the National Presto VEBA had claims incurred but not reported or reported but not paid in the amount of $377,225.

As of the close of the taxable year 1987, the books of the National Presto VEBA show total assets of $1,599,746 that do not include any accounts receivable. At the close of the taxable year 1987, the accrued claims for National Presto VEBA benefits that were incurred but unpaid totaled $853,771. At the close of the taxable year 1987, the National Presto VEBA did not have a reserve for postretirement benefits, supplemental unemployment benefits, or severance benefits.

In the statutory notice of deficiency, respondent disallowed $745,975 of the $1,025,021 deduction petitioner claimed for

its contribution to the National Presto VEBA during the 1987 taxable year.

OPINION

For the taxable year 1987, sections 419 and 419A, enacted as part of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98–369, sec. 511(a), 98 Stat. 484, 854–860, limit deductions for contributions made by a taxpayer to a welfare benefit fund. These provisions were signed into law by President Reagan on July 18, 1984, but became effective for taxable years ending after December 31, 1985. For purposes of sections 419 and 419A, a welfare benefit fund includes a voluntary employees' beneficiary association that is exempt from income tax under section 501(c)(9) (hereinafter referred to as a VEBA). Sec. 419(e)(3). Therefore, the amount that petitioner may deduct as a contribution to the National Presto VEBA for the taxable year 1987 is to be determined under sections 419 and 419A.

Section 419(a)(1) generally denies a deduction for contributions paid or accrued by an employer to a welfare benefit fund. If such contributions would otherwise be deductible, however, section 419(a)(2) permits a deduction for the taxable year in which the contribution is paid, limited to the amount determined under section 419(b).[3] Section 419(b) limits the amount of the deduction for any taxable year to the welfare benefit fund's "qualified cost" for the taxable year. The qualified cost for any taxable year is reduced by such fund's after-tax income for such taxable year. Sec. 419(c)(2). Any contribution to a welfare benefit fund in excess of the year's qualified cost is treated as a contribution by the employer to the fund during the succeeding taxable year. Sec. 419(d).

Section 419(c)(1) defines "qualified cost", with respect to any taxable year, as the sum of (1) the qualified direct cost

---

[3] Contributions paid to a welfare benefit fund after sec. 419 became effective with respect to such contributions are deemed related, first, to amounts accrued and deducted (but not paid) by the employer with respect to such fund before sec. 419 became effective with respect to such contributions and, thus, are not to be treated as satisfying the payment requirement of sec. 419. Sec. 1.419–1T, Q&A–1, Temporary Income Tax Regs., 51 Fed. Reg. 4323 (Feb. 4, 1986). During petitioner's 1987 taxable year, petitioner made cash payments of $1,705,633 to the National Presto VEBA. Petitioner applied $680,612 to previously deducted but unpaid contributions and took a deduction in the amount of $1,025,021 for the taxable year 1987.

for such taxable year,[4] and (2) subject to the limitation in section 419A(b), any addition to a "qualified asset account" for the taxable year. No item may be taken into account more than once in determining the qualified cost of any welfare benefit fund. Sec. 419(c)(5).

The term "qualified asset account" means any account consisting of assets set aside to provide for the payment of (1) disability benefits, (2) medical benefits, (3) SUB (supplemental unemployment compensation benefits) or severance pay benefits, or (4) life insurance benefits (hereinafter such benefits are referred to as employee benefits). Sec. 419A(a). An addition to a qualified asset account may be included in the fund's qualified cost, however, only to the extent such addition does not cause the amount in the qualified asset account to exceed the "account limit". Sec. 419A(b).

Generally, the account limit for any qualified asset account for any taxable year is the amount reasonably and actuarially necessary to fund claims incurred but unpaid (as of the close of such taxable year) for employee benefits and administrative costs with respect to such claims. Sec. 419A(c)(1). Under section 419A(i), the Secretary is authorized to prescribe such regulations as may be appropriate to carry out the purposes of sections 419 and 419A. Pursuant to that authority, section 1.419–1T, Q&A–5: (b)(1), Temporary Income Tax Regs., 51 Fed. Reg. 4324 (Feb. 4, 1986), provides that

contributions to a welfare benefit fund during any taxable year of the employer beginning after December 31, 1985, shall not be deductible for such taxable year to the extent that such contributions result in the total amount in the fund as of the end of the last taxable year of the fund ending with or within such taxable year of the employer exceeding the account limit applicable to such taxable year of the fund (as adjusted under section 419A(f)(7)). * * *

Thus, under the general rule, a taxpayer may deduct contributions made to a welfare benefit fund only to the extent

---

[4] "Qualified direct cost", with respect to any taxable year, means the aggregate amount (including administrative expenses) which would have been allowable as a deduction to the employer with respect to the benefits provided during the taxable year, if (i) such benefits were provided directly by the employer, and (ii) the employer used the cash receipts and disbursements method of accounting. Sec. 419(c)(3)(A). A benefit is treated as provided when such benefit would be includable in the gross income of the employee if provided directly by the employer (or would be so includable but for any provision of this chapter excluding such benefit from gross income). Sec. 419(c)(3)(B).

the contribution does not cause the fund to have assets at the end of the taxable year in excess of an amount necessary to pay incurred but unpaid claims and administrative costs with respect to such claims. In this case, the amount of the incurred but unpaid claims as of the close of the 1987 taxable year was $853,771. As a result of petitioner's contribution to the National Presto VEBA during the taxable year 1987, the National Presto VEBA had assets at the end of the taxable year in the amount of $1,599,746, which amount exceeded the account limit under the general rule by the amount of $745,975.[5]

For any of the first 4 taxable years ending after December 31, 1985, however, a special transitional rule applies to a welfare benefit fund which, as of July 18, 1984, had assets set aside for purposes of providing employee benefits. Sec. 419A(f)(7)(D). The transitional rule permits the account limit to be increased by the applicable percentage of any "existing excess reserves". Sec. 419A(f)(7)(A). For the taxable year ending December 31, 1987, the applicable percentage is 60 percent. Sec. 419A(f)(7)(B).

The "existing excess reserve" is the excess, if any, of (1) the amount of assets set aside at the close of the first taxable year ending after July 18, 1984, for purposes of providing employee benefits, over (2) the account limit determined without regard to the transitional rule provided in section 419A(f)(7) for the taxable year for which such increase is being computed. Sec. 419A(f)(7)(C).

As a result of petitioner's contribution to the National Presto VEBA during 1987, the National Presto VEBA had assets totaling $1,599,746 as of the close of the 1987 taxable year. As of the close of the 1987 taxable year, the National Presto VEBA had incurred but unpaid claims totaling $853,771. The total assets of the National Presto VEBA as of the close of the 1987 taxable year exceeded the amount of its incurred but unpaid claims by $745,975. See *supra* note 5. The parties agree that, unless the addition to the qualified asset account permitted under section 419A(f)(7) applies, petitioner's claimed deduction in the amount of $1,025,021 exceeded the permissible deduction of $279,046 by $745,975.

---

[5] The parties are in agreement as to this figure and apparently have not sought to increase the account limit by any amount for administrative costs with respect to incurred but unpaid claims of $853,771.

The books of the National Presto VEBA reflect that, as of the close of the 1984 taxable year, the VEBA had total assets in the amount of $2,408,732, consisting of $19,908 in cash plus a receivable from petitioner in the amount of $2,388,824. The issue to be decided in this case is whether the account receivable from petitioner in the amount of $2,388,824 reflected on the books of the National Presto VEBA as of the close of the taxable year ending December 31, 1984, constitutes "assets set aside" for purposes of section 419A(f)(7)(C)(i).

Petitioner contends that the account receivable reflected on the books of the National Presto VEBA constitutes an asset of the VEBA that was set aside for the purpose of providing employee benefits within the meaning of section 419A(f)(7). In support of its position, petitioner asserts that section 419A(f)(7) is unambiguous and treats an account receivable in the same manner as any other asset. Respondent asserts that the receivable is merely a book entry that does not constitute an asset that can be set aside for purposes of section 419A(f)(7). Respondent further asserts that, even if the receivable were legally enforceable, the receivable was not "set aside" for purposes of section 419A(f)(7).

The term "asset" and the phrase "assets set aside" are not defined in the statute. In interpreting any statute, the Court's principal objective is to determine Congress' intent in using the statutory language being construed. *United States v. American Trucking Associations,* 310 U.S. 534, 542 (1940); *General Signal Corp. v. Commissioner,* 103 T.C. 216, 240 (1994). If the statute is ambiguous, we may look to its legislative history and to the reason for its enactment. *United States v. American Trucking Associations, supra* at 543–544; *General Signal Corp. v. Commissioner, supra* at 240; *U.S. Padding Corp. v. Commissioner,* 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989).

Prior to the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98–369, 98 Stat. 494, taxpayers could obtain deductions for contributions paid or accrued to welfare benefit trusts, including contributions to VEBA's. Provided the contributions qualified as ordinary and necessary business expenses under section 162, no special limitations were imposed on the

amounts of the contributions to a welfare benefit trust.[6] Sec. 1.162–10(a), Income Tax Regs. Expenses do not accrue, however, until all events necessary to fix the employer's liability have occurred. See *United States v. General Dynamics Corp.,* 481 U.S. 239 (1987); sec. 1.461–1(a)(2), Income Tax Regs.

As part of DEFRA, Congress enacted sections 404(b)(2), 419, and 419A in response to concerns that certain funded welfare benefit trusts were being used as a subterfuge for providing deferred compensation to employees by allowing the employer a current deduction for contributions to the trust without a corresponding income inclusion by the recipient. The special deduction-timing rules and rules for measuring deductions under section 404 that apply to amounts paid under deferred compensation plans did not apply to deductions for welfare benefits if those benefits were not regarded as compensation. Furthermore, neither the Internal Revenue Code nor the regulations provided a definition that clearly distinguished welfare benefits from deferred compensation. Congress also was concerned that tax-exempt trusts such as VEBA's were being promoted as welfare benefit fund tax shelters. H. Rept. 98–432 (Part 2), at 1274–1275 (1984).

The legislative history of DEFRA clarifies that a distinction is to be made between "funded" benefit plans and "unfunded" benefit plans. As part of DEFRA, Congress enacted section 404(b)(2), which brings unfunded benefit plans within the timing and deduction limits of section 404(a).

Congress was concerned that an employer might promise to provide an employee with a benefit sometime in the future, and, even though the benefit is not funded, might claim a deduction before the benefit is provided to the employee. Accordingly, section 404(b)(2) provides:

PLANS PROVIDING CERTAIN DEFERRED BENEFITS.—

    (A) IN GENERAL.—For purposes of this section, any plan providing for deferred benefits (other than compensation) for employees, their spouses, or their dependents shall be treated as a plan deferring the receipt of compensation. In the case of such a plan, for purposes of this section, the determination of when an amount is includible in gross income shall

---

[6] Some expenses were subject to additional limitations and restrictions. See, for example, sec. 264 (deduction denied for certain life insurance premiums); sec. 267 (deductions denied for certain accrued but unpaid expenses if the expense is payable to a related, cash method person); sec. 274 (deductions denied for certain entertainment, amusement, and recreational facilities if the facilities are not primarily for the benefit of employees other than officers, owners, or highly compensated employees).

be made without regard to any provisions of this chapter excluding such benefits from gross income.

(B) EXCEPTION.—Subparagraph (A) shall not apply to any benefit provided through a welfare benefit fund (as defined in section 419(e)).

The legislative history explains:

if the benefit or other compensation is provided under a plan, method, arrangement, or similar understanding that a benefit will be provided in the future, it will be treated as provided under a plan deferring the receipt of compensation. * * *

\* \* \* \* \* \* \*

A *funded* welfare benefit plan would not be considered a plan of deferred compensation. A plan is not to be considered funded merely because the employer has purchased a benefit for employees. For example, a plan under which an employer makes a direct payment to an insurance company to purchase insurance benefits would not generally be considered a funded plan. On the other hand, if an employer makes a direct payment to an insurance company under a plan, pursuant to a typical "administrative services only" agreement under which the insurance company maintains a separate account to provide benefits, then the plan would be considered to be a funded plan because the benefits are purchased by the fund under the agreement.

An unfunded deferred benefit plan would be considered to be a plan of deferred compensation for purposes of the rules relating to the timing and amount of employer deductions for contributions. * * *

[H. Rept. 98–432 (Part 2), *supra* at 1282–1283; emphasis added.]

In light of the legislative history, we agree with the staff of the Joint Committee on Taxation that

an unfunded obligation of an employer or employee is not to be considered an asset set aside to provide a benefit. Accordingly, the existing excess reserve does not include any value attributable to such an obligation. [Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 788 (J. Comm. Print 1984).]

Petitioner asserts that the receivable was an asset of the National Presto VEBA because the audited financial statements of the National Presto VEBA, which were prepared by Coopers & Lybrand in accordance with generally accepted accounting principles, consistently listed the receivables from petitioner as an asset of the VEBA.

Under the terms of the National Presto VEBA trust documents, the corpus of the VEBA consists of

such sums of *money and other property* acceptable to the Trustee *as shall from time to time be paid or delivered to the Trustee* and such earnings,

profits, increments and accruals thereon as may occur from time to time, less the payments which at the time of reference shall have been made by the Trustee. * * * [Emphasis added.]

Under the terms of the trust document, the term "contributions" means *the money paid* to the VEBA by employers and plan participants, in accordance with the employers' *unilateral determination and discretion, except as may be required for the purchase or funding of specific levels of benefits provided by the VEBA and the payment of the expenses of establishing and administering the VEBA and the plans.* We think that payment of money or delivery of property requires more than a mere bookkeeping entry; such an entry does not create corpus or constitute a contribution and, therefore, does not create an asset of the VEBA.[7]

Petitioner further asserts that the trustees of the VEBA could have enforced the receivable obligation against petitioner at any time and, if the VEBA had inadequate other assets to meet its obligations, the trustees would have had a fiduciary obligation to pursue petitioner for these amounts. However, the record shows that, as of the close of the 1984 taxable year, the receivable reflected on the books as of that time greatly exceeded any liability petitioner may have had to pay to the VEBA.

The trust document shows that petitioner is obligated only to make a minimum contribution to the VEBA each fiscal year. The minimum contribution is an amount

to provide the payment of anticipated benefits during such year; plus, an amount sufficient to pay premium or other charges under any insurance policy or policies issued to the Trustee in connection with the Plan; and, the cost of legal, accounting, actuarial and administrative services. * * *

The fact that the fiscal policy of the VEBA trust document contemplated the level funding of the reasonably anticipated needs of the plan did not alter petitioner's actual liability to the VEBA. The purpose of that fiscal policy was to equalize to the extent possible each year's *contribution.* As noted above, the trust document defines contribution as *money paid* to the fund. Thus, the fiscal policy in the trust document was not followed.

---

[7] We note that there was no promissory note or other evidence of indebtedness; however, the existence of any such documentation would not affect the conclusion we have reached in this case.

In the event petitioner fails to remit the required contributions to the VEBA, the trustee is permitted to pay out of the fund, premiums and/or benefits on behalf of plan participants. In such event, petitioner remains liable for the full amount of contributions due during the period for which premiums and/or benefits were so paid by the trustee. Furthermore, the benefits provided to employees through the VEBA are limited to those that may be financed from the assets of the fund, after the payment of the expenses of establishing and administering the VEBA. The trust document expressly provides that petitioner had no liability for the furnishing of any specific type or amount of insurance or benefit to any employee, former employee, or any of their dependents, except as set forth in the plan or plans to be funded by the VEBA. The plans were not made part of the record in this case, and there is no evidence in the record that petitioner was obligated to provide future benefits to participants in the VEBA.

The record establishes that, as of the close of the 1984 taxable year, the National Presto VEBA had incurred but unpaid claims in the amount of $377,225, which amount exceeded the amount of cash held by the VEBA ($19,908) by $357,317. There is no evidence in the record to show that, as of the close of the taxable year 1984, petitioner was liable for any amount in excess of $357,317. Thus, even if an enforceable receivable constituted an asset set aside for purposes of section 419A(f)(7)(C)(i), the total amount of assets in the National Presto VEBA, as of the close of the 1984 taxable year, was $377,225. The "existing excess reserve" is the excess, if any, of (1) $377,225, the amount of the assets set aside at the close of the 1984 taxable year for purposes of providing employee benefits, over (2) $853,771, the account limit determined without regard to section 419A(f)(7) for the 1987 taxable year. Thus, there is no existing excess reserve within the meaning of section 419A(f)(7)(C). Therefore, there is no increase to the account limit under section 419A(f)(7).

In *General Signal Corp. v. Commissioner,* 103 T.C. 216 (1994), the taxpayer claimed that its account limit included a reserve established for postretirement medical and life insurance benefits within the meaning of section 419A(c)(2). Under section 419A(c)(2), the account limit for any taxable year includes a reserve funded over the working lives of the

covered employees as necessary for postretirement medical and life insurance benefits. The Court noted in *General Signal Corp. v. Commissioner*, 103 T.C. at 244, that, although the term "reserve" may be an actuarial term of art meaning "liability", such liability does not constitute a "reserve funded over the working lives of the covered employees". In other words, mere liability does not create a funded reserve; a funded reserve connotes the accumulation of assets and the funding of benefits. *Id.* at 244–246. Similarly, we do not think that a "liability" created by a mere bookkeeping entry constitutes an asset that can be set aside for purposes of section 419A(f)(7). The bookkeeping entry on the financial statements of the National Presto VEBA of a receivable from petitioner in the amount of $2,388,824 is not an asset set aside within the meaning of section 419A(f)(7).

To reflect the above holding and the concessions by petitioner,

*Decision will be entered for respondent.*